865 P.2d 808

Howard L. **MORTON** and M. Virginia Morton; Alex J. Morton; Jan E. Clark; Bonnie C. Morton; Jonathan T. Morton; Walter R. Morton; Brian David Morton, by and through his parents and Guardians Ad Litem, Howard and Virginia Morton, Audrey Pryor, and Thomas H. Morton, Plaintiffs/Appellees,

v.

**MARICOPA COUNTY,** a County Government, By and Through its **MARICOPA COUNTY BOARD OF SUPERVISORS** in their representative capacity. Defendant/Appellant.

No. 2 CA–CV 92–0185.

Court of Appeals of Arizona, Division Two, Department B.

March 4, 1993.

Review Denied Jan. 19, 1994.

Piatt & Livoni, P.C. by William M. Piatt, Phoenix, for plaintiffs/appellees.

Maricopa County Atty.'s Office by Gordon J. Goodnow, Jr., Phoenix, for defendant/appellant.

## OPINION

HATHAWAY, Judge.

This is an appeal from a judgment against appellant, Maricopa County, in favor of appellees, Howard and Virginia Morton and their eight living children (sometimes referred to collectively as "Mortons"), following a jury verdict for damages arising from the alleged negligence of the Maricopa County Sheriff's Office and the Maricopa County Medical Examiner's Office in identifying and disposing of human remains. We affirm the judgment of liability against Maricopa County, we reverse the judgment for damages, and we remand for a new trial, with directions, to determine damages only.

### FACTS AND PROCEDURAL HISTORY

Eighteen-year-old Guy Morton (Guy), the eldest son of Howard and Virginia Morton, was apparently murdered in Arizona and his body dumped in the desert near New River sometime after his disappearance on June 23, 1975. Guy's then-unidentified, incomplete skeletal remains were found by hunters in November 1975. Homicide was suspected and the remains were kept by the Medical Examiner until 1984, when they were incinerated, the Medical Examiner explained, due to space needs and lack of hope of discovering the decedent's identity.

Guy had suffered a head injury in a motorcycle accident in 1973, which reduced his mental capacity. In April 1975, Guy had

hitchhiked from Iowa to Florida. A convenience store clerk telephoned Guy's parents to inform them that Guy was broke and did not know where he was. In early May 1975, the Mortons sent Guy a bus ticket to return to Iowa. On May 10, 1975, Guy wanted to leave home again and his father drove him to the interstate and gave him $4, all the money in his wallet, so he could hitchhike west. Guy went to Colorado, then to Arizona where he visited a cousin in Phoenix. Guy's family never saw him again.

Andrew Maisano, a landscaper in Flagstaff who had employed Guy, dropped him off at the I-17 freeway outside of Flagstaff on June 23, 1975, to hitchhike to Phoenix to obtain a refund of a deposit he had made to purchase a used car. When he did not return, Maisano called Guy's father to report his disappearance. Upon recommendation of the Coconino County Sheriff's Office, Howard Morton filed a missing persons report with the Marion, Iowa Police Department in June 1975. Howard Morton testified that he called the Maricopa County Sheriff's Office for information in June or July 1975, but the Mortons filed no report there. He did not call the sheriff's office for information again until 1984. The next time Howard Morton had contact with the sheriff's office was in August 1987. The Mortons never communicated with the medical examiner's office.

In June 1987, 12 years after Guy's disappearance and three years after incineration of the unidentified remains, Guy's parents made a trip to Arizona to search for him. The Mortons maintained that they could not afford to look for him earlier. Howard and Virginia Morton spoke to the media and stories of Guy's disappearance permeated the news. Articles reported that Guy had a serious head injury from a motorcycle accident in 1973, resulting in mental slowness. A July 29, 1987, front page article in the *Arizona Republic* reported, "[b]ecause of the injury, Guy frequently was unable to use or understand words, Virginia Morton said."

By chance, this article was read by Sterling Hillebert, an investigator for the Navajo County Attorney's Office, formerly a sheriff's deputy who had previously attempted to identify the partial remains found in the desert in 1975. Hillebert contacted Detective Jeff Green in the Coconino County Sheriff's Office and suggested that Green request Guy's dental records for comparison. Detective Green obtained the records and they matched. Guy's parents, who then lived in Colorado, were notified of the identification on August 6, 1987. In October 1987, the homicide investigation was reopened by the sheriff's office. Guy's case remains an active, unsolved homicide.

On September 22, 1988, the Mortons filed this lawsuit. The Mortons contended that the Maricopa County Sheriff's Office was negligent in not identifying the partial skeletal remains before 1987, and the Maricopa County Medical Examiner was negligent in unceremoniously and disrespectfully incinerating Guy's then-unidentified remains. After a two-week trial, the jury found for the Mortons against the Maricopa County Sheriff's Office, the Maricopa County Medical Examiner's Office, and the Maricopa County Medical Examiner. The jury awarded each parent $250,000, Alex Morton $100,000, and the other seven siblings $50,000 each, for a total of $950,000. All post-trial motions were denied. This appeal was timely filed on December 18, 1990.[1]

## ISSUES ON APPEAL

Maricopa County argues on appeal that the trial court erred in denying its motion for: (1) judgment because the evidence presented was insufficient regarding any element of the alleged negligence to support the verdict; (2) a new trial under Ariz.R.Civ.P. 59(a)(8), 16 A.R.S., because the verdict was not justified by the evidence and was contrary to law; (3) a new trial under Ariz. R.Civ.P. 59(a)(7), because the verdict was a result of passion and prejudice; and, (4) a new trial or remittitur under Ariz.R.Civ.P. 59(a)(5), because the damages awarded were excessive. We affirm in part and reverse in part.

1. The notice of appeal provides that "defendants" appeal the judgment. However, by stipulation the judgment is solely against Maricopa County, the only appellant.

## DUTY TO IDENTIFY DEAD BODIES

■ Maricopa County contends that the trial court erred in denying its motion for judgment because the evidence presented was insufficient to support the jury's verdict, including evidence to prove a violation of duty. Whether there is a duty is an issue for the court. *Markowitz v. Arizona Parks Bd.*, 146 Ariz. 352, 354, 706 P.2d 364, 366 (1985). In *Markowitz*, the court stated:

> We have previously explained that we disapprove of attempts to equate the concept of duty with specific details of conduct. *Coburn v. City of Tucson*, 143 Ariz. 50, 52, 691 P.2d 1078, 1080 (1984). We there approved Dean Prosser's postulate that it is "better to reserve 'duty' for the problem of the relation between individuals which imposes upon one a legal obligation for the benefit of the other ..." Id., quoting W. Prosser & W. Keeton, THE LAW OF TORTS, § 53 at 356 (5th ed.1984). We again point out that the existence of a duty is not to be confused with details of the standard of conduct.... These details of conduct bear upon the issue of whether the defendant who does have a duty has breached the applicable standard of care and not whether such a standard of care exists in the first instance.

*Id.* at 355, 706 P.2d at 367.

■ Maricopa County cites *Shelton v. City of Westminster*, 138 Cal.App.3d 610, 188 Cal.Rptr. 205 (1982), as authority for the proposition that no "special relationship" exists to create a legal duty between Maricopa County and the Mortons. We find *Shelton* instructive and persuasive. The Sheltons filed a missing person's report with the Westminster Police Department in October 1979, after their son had been missing two months. The Sheltons claimed the defendant police department told them that the report would be investigated completely and fully. The Sheltons' son's body had been found in August 1979, a week after he had disappeared. California Penal Code § 11114 requires an investigating sheriff, after 30 days and consultation with the coroner or medical examiner, to file a missing person report and the dental records of any unidentified person with the Department of Justice for identifica-

tion purposes. Dental records were not filed with the Department of Justice and the Sheltons were not advised that their son's body was being held by the medical examiner until April 1980. The Sheltons brought suit against the city for not filing dental records sooner, as they alleged the statute required. The trial court dismissed the suit and the California Court of Appeals affirmed. The *Shelton* court stated:

> The police failure to act here is at best only in a remote causal relationship to the damage suffered. The prime cause, the direct and immediate cause of plaintiff's [sic] suffering is the murderous act of the person who killed a beloved son. The failure to request dental records with resultant delay in identification is not even a remote, tangential, cause of this wrongful act.

*Id.* at 618–619, 188 Cal.Rptr. at 210–211.

The Sheltons claimed that the city was negligent and "allege[d] there was a 'special relationship' when the City represented the missing person report would be fully and completely investigated." *Id.* at 621, 188 Cal. Rptr. at 212. In conclusion on this issue, the *Shelton* court said:

> Here there are no facts alleged to give rise to such "special relationship" between Sheltons and the City. Sheltons alleged only a failure to comply with Penal Code section 11114. *This does not create a special relationship.*
>
> Many duties are imposed in connection with investigating a missing person report including the dental record process. The request for such police aid, or the undertaking by the police to make a report and assure appropriate action will be taken does not create a "special relationship" from which "duty" is born. The grasp of that doctrine does not reach so far. The trial court properly sustained the City's demurrer to the second cause of action.

*Id.* at 621–622, 188 Cal.Rptr. at 213 (emphasis in original).

Arizona has no comparable statute requiring a medical examiner to submit dental records to another state agency. Neither the sheriff's office nor the Medical Examiner

made any representations to the Mortons regarding their investigations. The state's interest in identifying human remains is primarily to foster public safety through the investigation of suspected homicides. The identification of remains, of course, incidentally benefits friends and relatives. Because this is not the primary purpose, however, no relationship is created which would give rise to a duty to the Mortons.

Arizona requires the submission of fingerprints, but not dental records, to the Department of Public Safety. A.R.S. §§ 11–593(D), 41–1750(B), and 41–2411, et seq. Whether to impose a special duty on a sheriff's office and a medical examiner's office to file dental records, rather than, or in addition to, fingerprints of unidentified missing persons, we consider a matter for the legislature to decide. We deem it inappropriate to create such duty by judicial fiat. We hold that Maricopa County owed no legal duty to the Mortons either to submit dental records to the Department of Public Safety or to solve a homicide within any specific time frame.

## INTERFERENCE WITH DEAD BODIES

The Mortons also alleged that Maricopa County had a legal duty through its medical examiner's office to not negligently prevent the proper interment or cremation of Guy's dead body. We agree.

Arizona has recognized common law interference with dead bodies as actionable. *Tomasits v. Cochise Memory Gardens, Inc.*, 150 Ariz. 39, 721 P.2d 1166 (App.1986). According to the Restatement (Second) of Torts § 868 at 274 (1979):

> One who intentionally, recklessly or negligently removes, withholds, mutilates or operates upon the body of a dead person or prevents its proper interment or cremation is subject to liability to a member of the family of the deceased who is entitled to the disposition of the body.

The Arizona statutes in force at the time Guy Morton's remains were incinerated required the interment or cremation of dead bodies. A.R.S. §§ 11–251(27), 11–599 and 11–600. In 1984, A.R.S. § 36–831 established the following order for who had the duty of burial:

> A. The duty of burying the body of a dead person devolves in the following order:
>
> 1. If the dead person was married, upon the surviving spouse.
>
> 2. If the dead person was not married but left kindred, upon the persons in the same degree, nearest of kin to the dead person, of adult age and within the state and of sufficient means to defray the necessary expenses of burial.

We believe that Guy's parents, as the "nearest of kin," had a cause of action for mental distress and suffering against the medical examiner's office.[2] Guy's siblings would have been second in line, after his parents or children if he had any, to receive Guy's remains for interment or cremation.[3] See A.R.S. § 36–831(A)(4), which was revised by the legislature in 1986, so not applicable here, now includes "any person" in certain situations. We hold that Guy's brothers and sisters did not have standing to claim damages from the medical examiner's office for interference with the dead body. Moreover, none established a claim for negligent infliction of emotional distress damages, absent evidence the emotional distress was "manifested as a physical injury." *Keck v. Jackson*, 122 Ariz. 114, 115, 593 P.2d 668, 669 (1979). See also *Ball v. Prentice*, 162 Ariz. 150, 781 P.2d 628 (App.1989); *Rowland v. Union Hills Country Club*, 157 Ariz. 301, 757 P.2d 105 (App.1988); and *Quinn v. Turner*, 155 Ariz. 225, 745 P.2d 972 (App.1987). Although there was testimony that at least one brother received counselling about concerns over Guy's disappearance, there was no evidence showing the Morton children suffered

---

**2.** We note that comment (a) of the Restatement (Second) of Torts at 275 provides, "[t]here is no need to show physical consequences of the mental distress" for emotional damages resulting from negligent interference with dead bodies. This Restatement principle has been followed in Arizona. *Tomasits v. Cochise Memory Gardens, Inc.,* supra.

**3.** See A.R.S. § 36–931(A)(4), revised by the legislature in 1986 so not applicable here, which now includes "any person" in certain circumstances.

any physical symptoms from their alleged emotional distress. Hence, Guy's siblings could not recover damages under negligent infliction of emotional distress.

■ Maricopa County argues that Guy's incomplete skeleton is not a dead body, but just a body part. "Dead body" is not defined in the statutes above or elsewhere.[4] Accordingly, we will construe the phrase "according to the common and approved use of language." A.R.S. § 1–213. Historically, because human bones endure after other body parts disappear, bones have warranted special treatment, e.g., the removal and transfer of bones from one burial site to another calls for appropriate handling. History, literature, culture, and universal religious attitudes regularly regard human skeletal remains with respect. A few of many examples follow:

> And Moses took Joseph's bones with him: for he had adjured the children of Israel, saying: God will visit you; carry out my bones from hence with you.
>
> Exodus 13:19

> Good friend, for Jesu's sake forebear
>   To dig the dust enclosed here.
> Blest be the man that spares these stones,
>   Cursed be he that moves my bones.
>     Shakespeare's Epitaph
>     Familiar Quotations,
>     J. Bartlett, p. 212
>     (13th ed.1967)

We believe that a substantial set of human bones, as in this case, constitutes a dead body and that Guy Morton's skeletal remains were equivalent to a "dead body." Since 1986, there has been a statutory duty to inter or cremate such skeletal remains. A.R.S. § 36–831(B).

There was substantial evidence at trial to support a finding that the medical examiner's office negligently incinerated Guy Morton's dead body.

BY MR. PIATT: (On direct examination)

Q: In the case of remains that have not been identified, that are malodorous and not easily storable, if they are sent to—if they are sent to a funeral home and thereafter interred in a pauper's grave, are those remains made available to transfer— for transfer to the next of kin or whoever wants them?

BY DR. KARNITSCHNIG:

A: Yes.

Q: And in the process of your work, is there ever a professional reason or need to incinerate or destroy the remains of an identifiable skeleton or identifiable remains? Is there ever a professional reason or need to do that?

A: Well, professional reason perhaps not. A logistical reason. When you run out of space, and they are also running out of space at two county cemeteries. In fact, they were run—in fact, they were talking about burying them up right and in multiple layers because they are out of space.

That is why we—that is why we cremated or incinerated some things.

Q: All right. Well, customarily, the preservation of unidentified remains could be accomplished by interment, and when the remains were a skeleton, until such time as identification is made; right?

A: That's right.

Q: So if interment is available to you and interment is provided by law, and the county has to provide it, then what purpose would incineration serve?

A: Oh, merely to make space . . .

  *    *    *    *    *    *

Q: Okay. Do you feel in retrospect that it would have been better in this case to have had these remains interred rather than to have incinerated them as occurred?

A: Well, the retroscope is always really clear. And we wouldn't be here if that had been the case. And as I pointed out to you in the deposition, it was not my intent to have the skull cremated also. I had planned to keep the skull not for necessarily the reason—the purpose of identification, because I had lost hope. But for teaching purposes.

---

**4.** We note that at least two other statutes, which address permits for disinterment and transport for burial, specifically refer to "dead human remains" rather than "dead bodies." A.R.S. §§ 36–331 and 36–346.

Q: All right. Now, I think there was a— I think there was a time in 1984 that these remains came to be incinerated along with numerous other bits of material; correct?
A: Yes.

\* \* \* \* \* \*

Q: There is a difference between incineration and disposition in a crematory, isn't there?
A: Well, the effect is very similar.
Q: I realize the effect is they all end up in ashes, did you say, and did you say and smoke?
A: Yes.
Q: But isn't there a difference in disposing in a crematory and disposing in an incinerator?
A: Well, I suppose—it's a difference that has some emotional impact on some people. But as I said, the end effect is the same.
If you have a body, and you subject it to sufficient heat, you will render it into dust, into unidentifiable fine grade ashes.
And if you crank the temperature up even further, you will just have white, grayish white dust with nothing identifiable as part of a human. And that includes teeth.

Dr. Thomas H. Henry, a deputy Pima County medical examiner, testified that he was not aware of any Pima County cremations of homicide victims, without a relative's permission, and that he had never seen a whole body skeleton incinerated in an unauthorized noncrematorium in Pima County.

Mr. Eloy Ysasi, formerly an investigator for the Maricopa County Medical Examiner's Office, testified that homicide victims were kept 100 per cent of the time, because "that is your evidence." He further stated at trial, "I do not know of any case that was incinerated, certainly not a complete skeleton that you know is a homicide."

We affirm the judgment of liability against Maricopa County as to Howard and Virginia Morton for negligence of the medical examiner's office and vacate the judgment in favor of their eight living children.

In view of our conclusions that the claim of negligence based on conduct of the sheriff's office is unsupportable and because of the impossibility of allocating the amount of damages attributable to those activities, the issue of damages for acts of the medical examiner's office must be retried.

## CONCLUSION

In view of our holding, we do not address the other issues raised by Maricopa County. We affirm the judgment for liability against Maricopa County, reverse as to damages, and remand for a new trial on damages only for Howard and Virginia Morton for negligence of the medical examiner's office.

DRUKE, P.J., and FERNANDEZ, J., concur.