Chief Justice BALES,
with whom Justice BERCH joins, dissenting.
¶ 28 Today’s decision immunizes officers for negligently misinforming parents or oth *189 ers of the death of a loved one. This result does not promote desirable conduct by law enforcement officers; instead, it means that those who have suffered emotional trauma and even physical injury will have no potential for redress from those who incorrectly tell them they have lost a child or other family member. Because law enforcement officers who undertake to provide next-of-kin notifications should owe a duty of care in these circumstances, I respectfully dissent.
¶ 29 Concluding that no duty exists means that, “for certain categories of cases, defendants may not be held accountable for damages they carelessly cause, no matter how unreasonable their conduct.” Gipson v. Kasey, 214 Ariz. 141, 143-44 ¶ 11, 150 P.3d 228, 230-31 (2007). But recognizing a duty does not itself mean that a defendant will incur liability; a plaintiff must still prove the other elements of negligence (breach of the duty, causation, and damages). Id. at 143 ¶ 9, 150 P.3d at 230. Here, recognizing that law enforcement officers have a duty of care when they undertake to notify next of kin of the death of a family member comports with our common law, the Restatement (Second) of Torts § 323, and also the Restatement (Third) of Torts § 47(b). It is also good public policy.
¶ 30 We have not restricted the concept of duty to circumstances recognized in the Restatement. Instead, we have looked to whether the defendant, by virtue of his undertaking, has placed himself in a unique position to prevent harm to the plaintiff. See Stanley v. McCarver, 208 Ariz. 219, 223 ¶¶ 14-15, 92 P.3d 849, 853 (2004) (holding that duty existed as a matter of public policy independent of the Restatement). But even § 323, at least as interpreted by Arizona courts, would support the recognition of a duty here. As the majority acknowledges, we have applied the doctrine to purely economic harms. See McCutchen v. Hill, 147 Ariz. 401, 404, 710 P.2d 1056, 1059 (1985). I would similarly apply § 323 to recognize a duty when, as is the case here, the plaintiffs allege that they have suffered serious emotional harm as a result of another’s undertaking.
¶ 31 But even if we were to limit the doctrine to cases involving physical harm, I would still hold that the doctrine applies to cases involving notifications to next of kin of a child or loved one’s death. Such an undertaking categorically is one that an actor “should recognize as necessary for the protection of the other’s person or things,” Restatement (Second) of Torts § 323, even if we interpret “person or things” to mean only bodily or tangible harm. This is so because the Second Restatement defines “bodily harm” broadly:
[Ljong continued nausea or headaches may amount to physical illness, which is bodily harm; and even long continued mental disturbance, as for example in the case of repeated hysterical attacks, or mental aberration, may be classified by the courts as illness, notwithstanding their mental character. This becomes a medical or psychiatric problem, rather than one of law.
Restatement (Second) of Torts § 436A cmt. c.[1]
¶ 32 Learning of a child’s death is an event likely to cause continued, long-term mental disturbance, often with resulting physical manifestations. Such manifestations, we have previously recognized, provide a guarantee that damages are not purely speculative. See Keck v. Jackson, 122 Ariz. 114, 115, 593 P.2d 668, 669 (1979). Bereaved parents are at a significantly increased risk of psychiatric hospitalization. Jiong Li et ah, Hospitalization for Mental Illness Among Parents After the Death of a Child, 352 New Eng. J. Med. 1190, 1196 (2005); see also Shirley A. Murphey et al., PTSD Among Bereaved Parents Following the Violent Deaths of Their 12- to 28-Year-Old Children: A Longitudinal Prospective Analysis, 12 J. Traumatic Stress 273 (1999) (finding that “[p]arents de *190 scribe the death of a child as ‘devastating,’ ‘a pain like no other,’ and as an event that has incomprehensible, lasting changes on the family”). Learning that a close family member has been violently killed in an accident can trigger post-traumatic stress disorder. See American Psychiatric Association, PTSD Pact Sheet 1 (2013) (discussing new guidelines for the diagnosis of post-traumatic stress disorder in the Diagnostic and Statistical Manual of Mental Disorders, 5th ed.).
¶ 33 The majority suggests that, because the devastation from learning of a loved one’s death will occur irrespective of how one hears about it, the delivery of the news is not “necessary for the protection” of the next-of-kin’s person. See supra ¶ 12. This conclusion is belied by DPS’s own Next-of-Kin Notification Manual, which indicates that officers undertake to make these notifications precisely because they recognize that improperly delivered notifications can exacerbate the harm of learning of a loved one’s death. The undertaking thus seeks to protect against the increased harm risked by an improperly delivered notification, not from emotional harm altogether. Recognizing that officers are responsible for public safety, most people would believe the information they provide. And by undertaking to identify victims of accidents and notify their next of kin, the police protect the public from hearing the news from other, less reliable sources and from receiving it in a potentially unprofessional manner.
¶ 34 The best approach in this case, however, would be to simply adopt § 47 of the Restatement (Third) of Torts: Liability for Physical and Emotional Harm, which squarely addresses cases such as this one. That section provides:
An actor whose negligent conduct causes serious emotional harm to another is subject to liability to the other if the conduct:
(a) places the other in danger of immediate bodily harm and the emotional harm results from the danger; or
(b) occurs in the course of specified categories of activities, undertakings, or relationships in which negligent conduct is especially likely to cause serious emotional harm.
Section 47 even contains an illustration with facts strikingly similar to those of this case:
The Jonestown morgue negligently determines the identity of a corpse brought to it by the police department. Sadie, the sister and next of kin of the person who was erroneously determined to be the corpse, is contacted by the morgue, told of the death, and provided instructions about making final arrangements for disposal of the body. Sadie, who lives out of town, does so. Upon viewing the deceased, Sadie discovers that the deceased is not her sister. As a result of this episode, Sadie suffers serious emotional harm. Jones-town is subject to liability under Subsection (b).
Id. cmt. f. illus. 4.
¶ 35 Although the Guerras do not specifically urge us to adopt § 47, they do argue that the common-law principles underlying the duty-by-undertaking doctrine are broader than the rule stated in § 323. These principles are embodied in § 47(b). We have previously adopted the principle expressed in § 47(a) by endorsing its predecessor in earlier Restatements, see Keck, 122 Aiz. at 115, 593 P.2d at 669, and we should also endorse § 47(b). Athough we ordinarily would not consider arguments not formally preserved for our review, “we have made exceptions to questions that are of great public importance or likely to recur.” In re Leon G., 200 Aiz. 298, 301, 26 P.3d 481, 484 (2001), vacated on other grounds, Glick v. Arizona, 535 U.S. 982, 122 S.Ct. 1535, 152 L.Ed.2d 461 (2002). The duty of care owed by the State to its citizens by virtue of its undertakings is, in my view, such a question. Ad the directness with which § 47(b) applies to cases such as this counsels even more strongly in favor of its adoption.
¶ 36 In adopting the precursor to § 47(b), the District of Columbia Court of Appeals observed that “[c]ourts’ historic skepticism of emotional distress claims focused on three concerns: avoiding fictitious or trivial claims, the difficulty of establishing (or disproving) the nature and extent of the alleged mental injury, and limiting liability.” Hedgepeth v. Whitman Walker Clinic, 22 A.3d 789, 795 *191 (D.C.2011). I agree with that court and the commentary to § 47(b) that the rule as stated in the Third Restatement adequately accounts for each of these concerns. First, by limiting itself to “serious emotional harms,” the rule excludes trivial injuries. Second, by limiting its scope to those categories of activities “in which negligent conduct is especially likely to cause serious emotional harm,” such as notifications of a loved one’s death, the rule ensures recovery for only genuine harms whose authenticity is not likely to be in question. (Such is the case involving the death of a child.) And third, the rule protects against indeterminate liability by requiring a special relationship between the tortfeasor and the plaintiff by virtue of the undertaking.
¶ 37 I would thus endorse Professor Dobbs’s view that “[t]he undertaking initiates a duty commensurate with what the defendant has undertaken. That principle should apply no less in claims for emotional distress than it does in physical injury cases,” Dan B. Dobbs, Undertakings and Special Relationships in Claims for Negligent Infliction of Emotional Distress, 50 Ariz. L. Rev. 49, 51 (2008). This is consistent with the principle underlying the duty-by-undertaking doctrine — namely, that an actor incurs liability when, by virtue of his undertaking, he “has made the situation worse, either by increasing the danger, by misleading the plaintiff into the belief that it has been removed, or by depriving him of the possibility of help from other sources.” W. Page Keeton et ah, Prosser and Keeton on Torts § 56, at 381 (5th ed.1984) [hereinafter Prosser and Keeton ].
¶ 38 Recognizing that the State owed the Guerras a duty of care here is not inconsistent with the decisions in Vasquez v. State, 220 Ariz. 304, 206 P.3d 753 (App.2008), or Morton v. Maricopa County, 177 Ariz. 147, 865 P.2d 808 (App.1993). Neither of those cases involved a direct relationship between the police and the relatives of the deceased. Rather, the plaintiffs’ claims in those cases centered on what the police did not do (such as failing to solve a homicide quickly, to identify an accident victim, or to promptly reach out to the family). Here, by contrast, a direct relationship resulted once police officers undertook to contact the Guerras to advise them of their daughter’s death (a function whose primary purpose, unlike that in Morton, was to benefit the surviving relatives). See 177 Ariz. at 151, 865 P.2d at 812 (holding that no special relationship existed because the purpose of “identifying human remains is primarily to foster public safety through the investigation of suspected homicides,” and this function only “incidentally benefits friends and relatives”). Moreover, the Guerras’ complaint rests on what the officers did do: delivering inaccurate news of their daughter’s death.
¶ 39 The majority finds it unconvincing that the police could have no duty to conduct the underlying investigation, but that they could be held liable for carelessly communicating its conclusion. The Guerras, after all, do not fault the police for the manner of the delivery, but rather for the contents of what they communicated. The contents of what was communicated, the majority maintains, cannot be separated from the underlying investigation which the police originally had no duty to perform.
¶ 40 But that is precisely how the duty-by-undertaking doctrine works. Consider the case of the truck driver who undertakes to signal to other drivers that they may safely pass. That driver “may be under no obligation whatever to signal to a car behind him that it may safely pass.” Prosser and Keeton at 378. Similarly, police officers may be under no obligation to conduct an investigation. Vasquez, 220 Ariz. at 313 ¶ 30, 206 P.3d at 762; Morton, 177 Ariz. at 151, 865 P.2d at 812. But if the truck driver does signal, “he will be liable if he fails to exercise proper care and injury results.” Prosser and Keeton at 378. The care with which he carried out the signaling — a function which, like police investigations, he otherwise had no underlying duty to perform — becomes legally relevant once a special relationship is created between him and the drivers relying on him to signal with due care. Likewise, the care that police exercised in carrying out the investigation matters once they undertake to communicate the results to next of kin. At that point, a special relationship between the police and the next of kin exists so as to *192 sustain a duty of care. Like the truck driver’s not having a duty to wave drivers through in the first place, the police not having an underlying duty to conduct the investigation is beside the point once a special relationship is created.
¶ 41 In addition to concluding that no duty was created by undertaking, the majority argues that policy concerns support a “no-duty” rule. I respectfully disagree. As discussed above, § 47 of the Third Restatement circumscribes duty to such limited circumstances so as to prevent indeterminate liability. More importantly, though, the policy arguments made by the majority either expect too little of law enforcement officers (taking at face value the State’s assertion that they will refuse to undertake tasks unless they can do so with impunity), or they exaggerate the “drawbacks,” supra ¶ 20, of holding that officers owe a duty of care in telling someone a loved one has died.
¶ 42 “We do not favor special rules of tort nonliability or immunity.” Ontiveros v. Borah, 136 Ariz. 500, 512, 667 P.2d 200, 212 (1983). Indeed, judicially created rules of non-liability are exceedingly rare. Rather, “[t]his court is committed to the principle that no person and no group should be given special privileges to negligently injure others without bearing the consequences of such conduct.” Id. The same principle should apply to the State. No-duty rules “should be invoked only when all cases they cover fall substantially within the policy that frees the defendant of liability.” 1 Dan B. Dobbs, The Law of Torts § 227, at 579 (2001). This is not such a case.
¶ 43 The State maintains that imposing a duty in this case would risk having police officers abstain from delivering next-of-kin notifications altogether or to delay delivering notifications until they could be absolutely sure of their accuracy. But to entertain this argument is to accept the facile notion that one will not engage in conduct unless he can do so recklessly and with impunity. All members of society regularly engage in activities for which they owe duties of reasonable care to others. That we have a duty of care in operating a motor vehicle does not keep most of us from driving to work every day.
¶ 44 It is true that Gipson recognized that no-duty rules may be appropriate when “potential liability would chill socially desirable conduct or otherwise have adverse effects.” 214 Ariz. at 146 ¶ 29,150 P.3d at 233. But it is important to maintain the distinction between duty and the actual likelihood of liability. No-duty rules are appropriate when liability could realistically result and therefore deter socially beneficial conduct. It is impossible to assess “potential liability,” id., without some reference to the standard of care. The State’s claim that officers will delay notifications or avoid giving them altogether is credible only if the standard of care required that officers give perfect, conclusive information about a loved one’s fate or else face liability. But the standard of reasonable care does not demand perfection. See Co-bum v. City of Tucson, 143 Ariz. 50, 54, 691 P.2d 1078, 1082 (1984) (“The city is not bound to provide perfect intersections or streets, but only those which are ‘reasonably safe.’ ”). A factfinder is extremely unlikely to find that the State breached its duty of care if it hedged its news by emphasizing that the identification was tentative and the investigation ongoing.
¶ 45 More generally, the fact that certain conduct may be socially desirable does not itself warrant a no-duty rule. Duty, after all, is but “an expression of the sum total of those considerations of policy which lead the law to say that the particular plaintiff is entitled to protection.” Ontiveros, 136 Ariz. at 508, 667 P.2d at 208. Although potential liability may discourage some desirable conduct, recognizing a duty of care serves the important goals of deterring unsafe conduct and compensating those injured by another’s carelessness. That misidentification may rarely occur, see supra ¶ 24, does not support broadly absolving officers of any duty of care or denying persons injured by careless notifications any chance for redress. And the duty-by-undertaking doctrine — which we all agree applies to at least some physical harms — subjects actors who undertake to help others to potential liability. Thus, our endorsement of the doctrine rejects the notion that socially desirable undertakings *193 should, merely by virtue of their public benefit, be immunized from liability.
¶ 46 Because our law strongly disfavors categorical tort immunity, see Ontiveros, 136 Ariz. at 512, 667 P.2d at 212, and the interests in deterrence and compensation have particular force with respect to negligent notifications of the death of a child or other loved one, a no-duty rule is simply not appropriate here. I respectfully dissent.

. The Third Restatement rejects such a broad definition of bodily harm, but does so because it provides recovery for negligently inflicted emotional harms, whereas the Second Restatement did not. Restatement (Third) of Torts: Phys. & Emot. Harm § 4 cmt. d (“By explicitly providing for claims for negligently inflicted emotional harm in Chapter 8, this Restatement does not adopt [the Restatement (Second)’s] approach and indeed rejects it.”); see also id. § 47 (discussed infra ¶¶ 34-36).