323 P.3d 765

April Abigail GUERRA, a single woman, Plaintiff/Appellant,

v.

STATE of Arizona, a governmental entity; Robert Halliday, in his individual and official capacity as director of the Arizona Department of Public Safety; Officer John Doe Dudas (Badge # 6381); Officer John Doe Guerrero (Badge # 6756); Officer John Doe Ortiz (Badge # 6760); and Sergeant John Doe Ortolano (Badge 5439), Defendants/Appellees.

No. 1 CA–CV 12–0826.

Court of Appeals of Arizona, Division 1.

May 6, 2014.

484

Tidmore Law Offices LLP, Phoenix By Mick Levin, Counsel for Plaintiffs/Appellants.

Arizona Attorney General's Office, Tucson By Paul Correa, Counsel for Defendants/Appellees.

## OPINION

JONES, Judge.

¶ 1 This matter arises from a single vehicle accident in which one of five passengers died. Thereafter, due to confusion caused by the extent of the passengers' injuries, Officers of the Arizona Department of Public Safety errantly advised the family of a surviving passenger their daughter had died. Following the discovery of the true identity of the deceased, the errantly advised family brought suit for negligence, negligent training and intentional infliction of emotional distress. The trial court granted summary judgment to the State, and the family, Appellants April, Maria and Jose Guerra (collectively, the "Guerras"), appeal that ruling.[1] Finding the officers assumed a duty of reasonable care when they provided the family with a next of kin notification, we reverse the trial court's granting of summary judgment on the negligence claim. We affirm, however, the trial court's ruling on the Guerras' negligent training and intentional infliction of emotional distress claims.

## FACTS AND PROCEDURAL HISTORY [2]

¶ 2 On July 18, 2010, five friends were traveling home to Arizona from California when their vehicle suffered a rear tire fail-

ure, causing it to roll. During the rollover, two female passengers were ejected; one of them was pronounced dead at the accident scene.

¶ 3 The Arizona Department of Public Safety ("DPS") responded to the accident scene. Once there, DPS officers discovered a purse near the deceased that contained Arizona driver's licenses for April Guerra and M.C., who were close friends and shared similar physical attributes. Due to the extent of their injuries, none of the passengers were positively identified at the accident scene. DPS released the body of the decedent to the Maricopa County Medical Examiner's Office as "Jane Doe," and airlifted the four remaining passengers, three females and one male, to St. Joseph's Hospital.

¶ 4 DPS Sergeant Ortolano directed DPS Officers Ortiz and Guerrero, who were not present at the accident scene, to identify the four passengers being treated at the hospital. Volunteer DPS Chaplain Eddingfield subsequently joined the two officers at the hospital.

¶ 5 Once at the hospital, Officers Ortiz and Guerrero interviewed the driver, Laura P. She self-identified and provided the officers with the names of the vehicle's other occupants, two of whom were M.C. and April.

¶ 6 Next, Officers Ortiz and Guerrero contacted the nurse who appeared to be in charge of the hospital's emergency care unit (the "charge nurse") to determine if the hospital had been able to identify any of the patients. After speaking with other hospital staff, the charge nurse told them two female patients had not yet been identified, but that she would find out their identities. After the charge nurse talked to family members and hospital staff, she concluded one of the female patients was G.M., meaning the remaining unidentified female patient was either M.C. or April.

1. The complaint named as defendants: the State of Arizona; DPS Director Robert Halliday; DPS Sergeant John Doe Ortolano; DPS Officers Ortiz, Dudas, and Guerrero; DPS Chaplain Ed Eddingfield; and Jane Does Ortiz, Dudas, Halliday, Ortolano, Eddingfield and Guerrero.

2. "On appeal from a grant of summary judgment, we view all facts and reasonable inferences therefrom in the light most favorable to the party against whom judgment was entered." *Bothell v. Two Point Acres, Inc.*, 192 Ariz. 313, 315, ¶ 2, 965 P.2d 47, 49 (App.1998).

¶ 7 When the charge nurse next spoke to the officers, she informed them April's family had advised her that April had a birth mark on her chest. After examining the remaining unidentified patient, the charge nurse concluded the patient did not have the described birth mark. During this time, Officer Ortiz contacted another DPS officer who was at the accident scene to inquire if the decedent had the birth mark; as a result of the severity of the injuries, however, the officer could not determine if the decedent bore the described birth mark. After obtaining more information regarding the passengers' clothing and other possible identifying marks, the charge nurse identified the remaining unidentified patient as M.C., and told the officers she was certain of her identification. Thereafter, by process of elimination, the officers determined the deceased passenger was April.

¶ 8 April's mother, Maria, and aunt were then placed in a hospital conference room where, pursuant to DPS's Next of Kin ("NOK") Notification Manual, Officers Ortiz and Guerrero and Chaplain Eddingfield notified them of April's death. Following the notification, Chaplain Eddingfield told Maria she still needed to positively identify the body at the Medical Examiner's Office. Maria then called April's father, Jose, who was out of town, to inform him of their daughter's death.

¶ 9 The next day, April's family contacted the Medical Examiner's Office and was advised they would not be able to view the body until it was released to a funeral home. The family was also requested to have April's dental records forwarded to the Medical Examiner's Office to help with the identification. The Medical Examiner's Office informed the family that the body would be released for burial preparation on July 24, 2010.

¶ 10 Before releasing the body, however, the Medical Examiner's Office contacted Sergeant Ortolano and informed him that April's dental records did not match those of the decedent. Sergeant Ortolano, along with another DPS officer and a chaplain, visited the Guerra family to advise them of the develop-ment and gather more identifying information for April. The Guerra family informed the officers that April recently had her wisdom teeth removed, had the tragus of her left ear pierced, and stated again that April had a birth mark on her chest. The Guerra family also provided the officers with school identification cards for both April and M.C.

¶ 11 Officers then visited the hospital to examine the patient previously identified as M.C, and observed a small mark on the patient's chest and that her left ear tragus appeared to be pierced. While at the hospital, the officers spoke with M.C.'s family and informed them of the recent developments. When asked for further information to help positively identify the female patient, M.C.'s family stated they believed M.C. still had her wisdom teeth and they remembered she had a scar on her abdomen from an appendectomy. The patient, then believed to be M.C., did not have a scar on her abdomen.

¶ 12 The Guerra family then informed Sergeant Ortolano they had located a child identification card for April that contained her thumbprint. Officers matched the thumbprint of the patient at St. Joseph's to the thumbprint on April's identification card, and positively identified the person previously believed to be M.C. as April. On July 26, the deceased passenger was positively identified as M.C.

¶ 13 The Guerras sued the State, alleging claims of negligence, negligent training, and intentional infliction of emotional distress ("IIED"). The State then moved for summary judgment on all claims; the Guerras cross-moved for partial summary judgment on the issue of duty, arguing the State had assumed a duty of reasonable care when its officers undertook the NOK notification. The trial court granted the State's motion for summary judgment and denied the Guerras' cross-motion, impliedly finding the State did not owe a duty to the Guerras. The Guerras timely appealed.[3] We have jurisdiction pursuant to Arizona Revised Statutes ("A.R.S.")

---

3. Although the notice of appeal filed by the Guerras named only April Guerra as the appealing party, the State has not argued that Maria and Jose Guerra are not proper parties to this appeal.

sections 12–120.21(A)(1) (2014)[4] and – 2101(A)(1) (2014).

### Standard of Review

¶ 14 Summary judgment is appropriate if the moving party shows there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law. Ariz. R. Civ. P. 56(a). A court may grant summary judgment if the "facts produced in support of the claim or defense have so little probative value, given the quantum of evidence required, that reasonable people could not agree with the conclusion advanced by the proponent of the claim or defense." *Orme Sch. v. Reeves,* 166 Ariz. 301, 309, 802 P.2d 1000, 1008 (1990). Even if the facts are not disputed, summary judgment is improper if the evidence does not demonstrate that the movant is entitled to judgment as a matter of law. *Comerica Bank v. Mahmoodi,* 224 Ariz. 289, 291, ¶ 12, 229 P.3d 1031, 1033 (App. 2010). We determine de novo whether any genuine issues of material fact exist and whether the trial court properly applied the law. *L. Harvey Concrete, Inc. v. Agro Constr. & Supply Co.,* 189 Ariz. 178, 180, 939 P.2d 811, 813 (App.1997).

### Discussion

¶ 15 The Guerras first argue the trial court should not have granted summary judgment for the State on their negligence claim because the State assumes a duty of reasonable care when notifying next of kin of a person's death. We agree.

### I. Negligence–Duty

¶ 16 To establish a claim for negligence, a plaintiff must prove four elements: 1) a duty requiring the defendant to conform to a certain standard of care; 2) a breach of that standard of care; 3) a causal link between the defendant's conduct and the resulting injury; and 4) actual damages. *Gipson v. Kasey,* 214 Ariz. 141, 143, ¶ 9, 150 P.3d 228, 230 (2007). Whether the defendant

owes the plaintiff a duty of care is a "threshold issue; absent some duty, an action for negligence cannot be maintained." *Id.* at 143, ¶ 11, 150 P.3d at 230. Therefore, absent a duty, the law does not require the defendant to conform to a particular standard of conduct in order to protect others from unreasonable risks of harm. *Vasquez v. State,* 220 Ariz. 304, 311, ¶ 21, 206 P.3d 753, 760 (App.2008). Whether a duty exists is a matter of law, which we review de novo. *Gipson,* 214 Ariz. at 143, ¶ 9, 150 P.3d at 230; *Vasquez,* 220 Ariz. at 311, ¶ 22, 206 P.3d at 760.

¶ 17 "As a legal matter, the issue of duty involves generalizations about categories of cases." *Gipson,* 214 Ariz. at 143, ¶ 10, 150 P.3d at 230. A duty is an obligation, recognized by law, "which requires the defendant to conform to a particular standard of conduct in order to protect others against unreasonable risks of harm." *Id.* In determining whether a duty exists, Arizona courts no longer consider whether the risk of harm to a person was foreseeable. *Id.* at 144, ¶ 15, 150 P.3d at 231. Instead, "[d]uties of care may arise from special relationships based on contract, family relations, or conduct undertaken by the defendant;" however, such a special relationship is not necessary to the finding of a duty. *Id.* ¶ 18; *Delci v. Gutierrez Trucking Co.,* 229 Ariz. 333, 336, ¶ 12, 275 P.3d 632, 635 (App.2012); *see also Stanley v. McCarver,* 208 Ariz. 219, 221–22, ¶ 8, 92 P.3d 849, 851–52 (2004) (stating "courts have imposed duties for the protection of persons with whom no preexisting 'relationship' existed"). A duty of care may also be based upon public policy. *Gipson,* 214 Ariz. at 145, ¶ 23, 150 P.3d at 232.

¶ 18 Neither a contractual relationship nor a traditional common law relationship giving rise to a duty, such as landowner-invitee or tavern owner-patron, is present here. The Guerras, however, contend the officers assumed a duty by undertaking to perform the NOK notification.[5] The State, citing *Morton*

---

4. Absent material revisions from the relevant period, we cite the current version of a statute.

5. The Guerras rely upon the Restatement (Second) of Torts § 323 (1965) to support their argu-

ment that the State assumed a duty of care to them. Restatement § 323 provides:

One who undertakes, gratuitously or for consideration, to render services to another which he should recognize as necessary for the pro-

*v. Maricopa County* and *Vasquez v. State,* maintains Arizona courts have rejected the imposition of a duty upon the government to properly identify crime and accident victims. However, both cases are distinguishable as neither involved the issue before us: whether law enforcement agencies affirmatively assume a duty by undertaking to notify a decedent's family of the decedent's death.

¶ 19 In *Morton,* police were alerted to unidentified and incomplete skeletal remains. 177 Ariz. 147, 148, 865 P.2d 808, 809 (App. 1993). Due to circumstances surrounding the person's disappearance and the body's condition, it was years before authorities identified the remains. *Id.* at 149, 865 P.2d at 810. The decedent's parents sued Maricopa County for negligence in identifying the body. *Id.* Unlike the immediate case, the *Morton* court noted that, "[N]either the sheriff's office nor the Medical Examiner made any representations to the Mortons regarding their investigation." *Id.* at 150–51, 865 P.2d at 811–12. The *Morton* court, relying upon the reasoning of *Shelton v. City of Westminster,* 138 Cal.App.3d 610, 188 Cal. Rptr. 205 (1982), held that "Maricopa County owed no legal duty to the Mortons either to submit dental records to the Department of Public Safety or to solve a homicide within any specific time frame." *Morton,* 177 Ariz. at 151, 865 P.2d at 812. In *Vasquez,* a person died when his vehicle rolled during a high speed pursuit with DPS and Cochise County Sherriff's Officers. 220 Ariz. at 306, ¶ 3, 206 P.3d at 755. Law enforcement did not identify the decedent until two months after he was buried as an indigent. *Id.* The *Vasquez* majority found the State and Cochise County owed no duty to the deceased's mother to investigate the accident more thoroughly or to identify her son. *Id.* at 315, ¶ 37, 206 P.3d at 764. The *Vasquez* majority also noted that a "special relationship between an investigating law enforcement agency and a decedent's family member does not arise merely by the agency undertaking to investigate" nor does the duty to identify the deceased arise because law enforcement does investigate. *Id.* at 313, ¶ 30, 206 P.3d at 762. The majority found *Morton* held that law enforcement agencies do not owe a duty to family or friends to identify a decedent. *Id.*

¶ 20 The dissent in *Vasquez* specifically recognized that duties of care may arise from conduct a person has undertaken, and that although the police owed no duty to protect citizens from "all harms," a duty of reasonable care arose to protect the surviving family members of a crime victim once the police "opted to provide police protection." *Id.* at 318, ¶ 49, 206 P.3d at 767 (citing *Gipson,* 214 Ariz. at 145, ¶ 18, 150 P.3d at 232) (quoting *Austin v. City of Scottsdale,* 140 Ariz. 579, 581–82, 684 P.2d 151, 153–54 (1984)); *Stanley v. McCarver,* 208 Ariz. 219, 221, ¶ 7, 92 P.3d 849, 851 (2004). Moreover, the *Vasquez* majority did not foreclose the existence of a duty of reasonable care arising, as in the immediate case, where law enforcement undertook to perform a specific act; to wit: the delivery of a NOK notification. *Id.* ("We do not quarrel with the dissent's general proposition that defendants, including law enforcement agencies, may acquire a duty of care to others by undertaking conduct.") (internal quotations omitted).

■ ¶ 21 Arizona courts clearly acknowledge that conduct may give rise to a duty, and have previously applied this proposition to law enforcement. *McDonald v. City of Prescott,* 197 Ariz. 566, 5 P.3d 900 (App.2000) (finding police assumed a duty by routinely undertaking to remove or warn of dangerous highway conditions); *see, e.g., Stanley,* 208 Ariz. at 223–24, ¶¶ 14–16, 92 P.3d at 853–54; *Knauss v. DND Neffson Co.,* 192 Ariz. 192, 198, 963 P.2d 271, 277 (App.1997) ("A party may voluntarily assume a duty not imposed at common law and, once assumed, must

tection of the other's person or things, is subject to liability to the other for physical harm resulting from his failure to exercise reasonable care to perform his undertaking, if
(a) his failure to exercise such care increases the risk of such harm, or
(b) the harm is suffered because of the other's reliance upon the undertaking.

The *Vasquez* Court stated that this section was "so clearly inapplicable" when police undertake to investigate the identity of a decedent that the plaintiff in that case had not even cited or relied upon it. *Vasquez,* 220 Ariz. at 314 n. 7, ¶ 32, 206 P.3d at 763 n. 7. Given how we resolve this issue, we need not decide whether this section is applicable to this case.

discharge the duty with reasonable care."); *Bishop v. State,* 172 Ariz. 472, 475, 837 P.2d 1207, 1210 (App.1992) ("An actor who gratuitously undertakes to render services agrees to exercise reasonable care in performing the undertaking."). DPS recognizes a responsibility to notify next of kin; as evidenced by the NOK Notification Manual it created.[6] As Sergeant Ortolano stated in a declaration submitted with the summary judgment motion, the officers' actions in this case were within the scope of their regular duties. To this end, DPS officers are provided training to ensure they appropriately relate timely and direct information to surviving family members. Taken together, these actions illustrate DPS has assumed the task of providing NOK notifications, and therefore, has a duty to provide those notifications with reasonable care.

¶ 22 The State argues a duty cannot attach in this circumstance because it is impossible to separate the underlying investigation, to which no duty attaches, from the NOK notification, which the State argues to be the culmination of the investigation. That is not the case. An investigation into the identity of a decedent can be completed, with nothing further to be done, without a NOK notification ever occurring. Everything precedent to notification of the next of kin might be determined to be investigative. However, once law enforcement concludes sufficient evidence exists to support a NOK notification, it is necessarily the case that the investigation into the decedent's identity is, at that point, complete. If law enforcement then undertakes a NOK notification, such is independent of the investigation itself.

¶ 23 The State also argues that public policy concerns dictate a finding that no duty exists in this circumstance. *See Gipson,* 214 Ariz. at 146, ¶ 29, 150 P.3d at 233 ("When a court or legislature adopts a no-duty rule, it generally does so based on concerns that potential liability would chill socially desirable conduct or otherwise have adverse ef-

fects."); *Stanley,* 208 Ariz. at 225, ¶ 20, 92 P.3d at 855 (considering whether the imposition of a duty on a physician to a non-patient would " 'chill' doctors from doing pre-employment exams and open the floodgates of litigation"); *Ontiveros v. Borak,* 136 Ariz. 500, 512, 667 P.2d 200, 212 (1983) (stating that in some situations "the public interest ... require[s] special rules to protect certain businesses, professions or occupations from the ordinary theories of tort liability").

¶ 24 Both *Vasquez* and *Morton* found public policy militated against the imposition of a duty when law enforcement investigates a deceased's identity:

> The state's interest in identifying human remains is primarily to foster public safety through the investigation of suspected homicides. The identification of remains, of course, incidentally benefits friends and relatives. Because this is not the primary purpose, however, no relationship is created which would give rise to a duty to the [decedent's surviving family].

*Vasquez,* 220 Ariz. at 315, ¶ 35, 206 P.3d at 764 (quoting *Morton,* 177 Ariz. at 151, 865 P.2d at 812). However, a NOK notification is different than an investigation into the identity of a deceased. There is little doubt that the primary purpose of a NOK notification is not to foster public safety but is, instead, to directly benefit the decedent's next of kin. *See id.* at 319–20, ¶ 54, 206 P.3d at 768–69 (Eckerstrom, J., concurring in part, dissenting in part) (arguing the Court should have imposed a duty as "the [decedent's] mother would have been an obvious and primary beneficiary of the agencies' efforts to identify [the decedent's] remains—and that, by undertaking the task of doing so, the agencies created a special relationship with her"). DPS's own manual further evidences that the purpose of the NOK notification is to benefit specific, individual survivors, rather than the public at large:

---

6. We clarify that the existence of the manual does not establish the duty in this case. *See, e.g., Continental Bank v. Fitting,* 114 Ariz. 98, 100, 559 P.2d 218, 220 (App.1977) (rejecting the argument that a bank's internal policies "in and of themselves give rise to a duty" to adhere to those

policies in every instance in the face of contrary statutory authority). Rather, the manual merely trains officers in how to give a NOK notification, and evidences that DPS has assumed responsibility for providing those notifications.

This manual is to *assure next-of-kin (NOK) survivors receive death notification in a supportive and sensitive manner.* This manual will enable officers to deliver critical information and support to survivors in a compassionate manner while assuring their own preservation.

The Department's policy is to have its officers familiar with concepts and procedures set forth in this manual *to provide survivors with sufficient useful information and support in a manner consistent with professionally accepted crisis intervention techniques.* After a violent death, *the NOK notification is one of the most defining events for a survivor. The first interaction is the cornerstone of the survivor's recovery process.... Poorly delivered death notifications exacerbate the mental distress of survivors, predisposing them to later complications dealing with grief and trauma.*

Given the primary purpose of the notification is to benefit the survivors, coupled with the weight society gives law enforcement's statements, and the inarguably devastating emotional impact a family member's death has on survivors, when the State undertakes the actual NOK notification it must communicate the information with reasonable care being given to the accuracy of what is conveyed.[7]

¶ 25 Nevertheless, the State argues the imposition of a duty in this situation would expose law enforcement agencies to a flood of litigation. However, the duty we recognize here does not require law enforcement "to protect each citizen within [a municipality's] geographic boundaries from all harms," nor does it impose "a duty to all persons to act reasonably at all times under all circumstances." *Austin v. City of Scottsdale,* 140 Ariz. 579, 582 n. 2, 684 P.2d 151, 154 n. 2 (1984); *Vasquez,* 220 Ariz. at 313, ¶ 29, 206 P.3d at 762. Further, the duty we recognize does not stretch the concept of acquiring a duty of care by undertaking conduct "beyond reasonable limits." *Vasquez,* 220 Ariz. at 313, ¶ 31, 206 P.3d at 762 (noting the concern of "theoretically giv[ing] rise to a cause of

action by the victim or a deceased victim's relatives for negligent investigation" in every unsolved crime). The duty of reasonable care only arises after the underlying investigation is complete and law enforcement undertakes the affirmative act of communicating notice of a person's death to survivors.

¶ 26 The State further contends that the imposition of a duty would chill socially desirable communications between law enforcement and the public. However, DPS already has in place its NOK Notification Manual which requires DPS Officers to provide NOK notifications in an appropriate manner, and Sergeant Ortolano acknowledged that withholding the identification from the Guerra family "would have been improper."

¶ 27 The State also correctly asserts the "public interest in receiving timely communications about significant facts discovered through police work is undisputable." Although timeliness in situations such as this is clearly a concern, so too is the public interest in being able to rely upon the accuracy of what law enforcement agencies and officers communicate.

■ ¶ 28 Consequently, we hold the State assumed a duty of reasonable care when officers delivered the NOK notification to the Guerra family.

## II. Negligent Training

¶ 29 The Guerras also argue the trial court should not have granted summary judgment in favor of the State on their negligent training claim because they presented sufficient evidence to preclude summary judgment. We disagree.

■ ¶ 30 To prevail on a negligent training claim, a plaintiff must show a defendant's training or lack thereof was negligent and that such negligent training was the proximate cause of a plaintiff's injuries. *Inmon v. Crane Rental Servs., Inc.,* 205 Ariz. 130, 137, ¶ 28, 67 P.3d 726, 733 (App.2003), *disapproved of on a different ground, Tarron v. Bowen Mach. & Fabricating,* 225 Ariz. 147, 235 P.3d 1030 (2010). A showing of an

7. We note the duty extends only to the information conveyed to the NOK, rather than the manner in which such information is provided.

employee's incompetence is not necessarily enough; the plaintiff must also present evidence showing what training should have been provided, and that its omission proximately caused the plaintiff's injuries. *Id.* at 137, ¶ 28, 67 P.3d at 733.

¶ 31 Here, as the State argues, the Guerras made no showing that the training given to the DPS Officers, or omitted from their training, was negligent. The Guerras argue the DPS's NOK Notification Manual failed to provide: 1) a definition of positive identification; 2) guidelines for what is required to make a positive identification; and 3) guidance on what is required for a positive identification by a third party.[8] However, the Guerras provided no evidence as to any other training that should have been provided, or how the given training was deficient.

¶ 32 The Guerras argue that "DPS officers ineptly executed what little guidance they had from DPS on how to properly identify and notify the next-of-kin." Although the DPS officers may not have correctly determined the deceased's identity, alleged negligence in performing job duties does not automatically amount to a showing of negligent training. *See Inmon,* 205 Ariz. at 137, ¶ 28, 67 P.3d at 733. The trial court properly granted summary judgment on this count.

### III. Intentional Infliction of Emotional Distress

¶ 33 Finally, the Guerras argue the trial court should not have granted summary judgment on the IIED claim as a reasonable jury could have found the State's actions were extreme and outrageous. We disagree. Arizona courts have adopted the requisite elements of an IIED claim from the Restatement (Second) of Torts § 46 (1965). *See Ford v. Revlon,* 153 Ariz. 38, 43, 734 P.2d 580, 585 (1987); *Mintz v. Bell Atl. Sys. Leasing Int'l, Inc.,* 183 Ariz. 550, 554, 905 P.2d 559, 563 (App.1995). Under the Restatement

test, 1) the defendant's conduct must be extreme and outrageous; 2) the defendant "must either [have] intend[ed] to cause emotional distress or recklessly disregard[ed] the near certainty that such distress would result from his conduct;" and 3) "severe emotional distress must indeed [have] occur[ed] as a result of defendant's conduct." *Ford,* 153 Ariz. at 43, 734 P.2d at 585.

¶ 34 It is the duty of the court to determine, in the first instance, whether the defendant's conduct is so extreme and outrageous to allow the issue to be submitted to the jury. Restatement § 46 cmt. h; *Watts v. Golden Age Nursing Home,* 127 Ariz. 255, 258, 619 P.2d 1032, 1035 (1980). Liability is appropriate "where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." *Ford,* 153 Ariz. at 43, 734 P.2d at 585 (quoting Restatement § 46 cmt. d); *Mintz,* 183 Ariz. at 554, 905 P.2d at 563. Because the term "outrageous conduct" is "not readily capable of precise legal definition, a case-by-case analysis is required." *Lucchesi v. Frederic N. Stimmell, M.D., Ltd.,* 149 Ariz. 76, 79, 716 P.2d 1013, 1016 (1986).

¶ 35 The Guerras argue the conduct in this case was extreme and outrageous because the officers knew the Guerras were particularly susceptible to emotional distress and abused their position of authority. *See Mintz,* 183 Ariz. at 554–57, 905 P.2d at 563–66 (stating relevant factors in determining outrageousness are 1) defendant's knowledge that plaintiff is particularly susceptible to emotional distress, 2) whether a legitimate business purpose existed for defendant's actions, and 3) abuse by the actor of a position "which gives him actual or apparent authority over the other, or power to affect his interests") (citing Restatement § 46 cmts. e-g). Although the Guerras were clearly sus-

---

8. DPS's NOK Notification Manual provides, in pertinent part:

   If positive identification cannot be accomplished for any of several reasons (e.g., body decomposition or other injury, or pictures are not available), dental records, fingerprints, DNA samples, or birth certificates may be of

value. Alternatively, if positive identification is provided by a third party (relative, friend, business associate) all circumstances surrounding the identification should be documented (information concerning who the third party performing the identification was, the relationship or association to the deceased, etc.).

ceptible to emotional distress, the officers did not proceed heartlessly in the face of such knowledge; rather, they were attempting to provide information to help the family begin the grieving process. Further, the Guerras presented no evidence that the officers abused their position.

¶ 36 As a matter of law, the conduct by the officers in this case cannot be said to have been so extreme or outrageous as to be utterly intolerable in a civilized society. The Guerras failed to present any evidence illustrating the officers acted in anything other than good faith upon what the charge nurse had told them in attempting to provide the NOK Notification. As the Guerras cannot satisfy the first element of their IIED claim, the trial court properly granted summary judgment for the State on this claim.

### Conclusion

¶ 37 Based upon the foregoing, we reverse summary judgment on the Guerras' negligence claim, grant the Guerras' motion for partial summary judgment on the issue of duty on their negligence claim, and remand to the trial court for further proceedings consistent with this opinion. We affirm, however, summary judgment in favor of the State on the Guerras' claims for negligent training and intentional infliction of emotional distress.