IN THE

# SUPREME COURT OF THE STATE OF ARIZONA

**APRIL ABIGAIL GUERRA, A SINGLE WOMAN,**
*Plaintiff/Appellant,*

*v.*

**STATE OF ARIZONA, A GOVERNMENTAL ENTITY; ROBERT HALLIDAY, IN HIS INDIVIDUAL AND OFFICIAL CAPACITY AS DIRECTOR OF THE ARIZONA DEPARTMENT OF PUBLIC SAFETY; OFFICER JOHN DOE DUDAS (BADGE #6381); OFFICER JOHN DOE GUERRERO (BADGE #6756); OFFICER JOHN DOE ORTIZ (BADGE #6760); AND SERGEANT JOHN DOE ORTOLANO (BADGE #5439),**
*Defendants/Appellees.*

No. CV-14-0144-PR

Filed May 8, 2015

Appeal from the Superior Court in Maricopa County
The Honorable John Christian Rea, Judge
No. CV2011-011444
**AFFIRMED**

Opinion of the Court of Appeals, Division One
234 Ariz. 482, 323 P.3d 765 (App. 2014)
**VACATED IN PART**

COUNSEL:

Mick Levin (argued), Tidmore Law Offices, L.L.P., Phoenix, Attorney for April Abigail Guerra

Mark Brnovich, Arizona Attorney General, John R. Lopez IV, Solicitor General, Daniel P. Schaack (argued), Assistant Attorney General, Phoenix,

Robert R. McCright, Assistant Attorney General, Tucson, Attorneys for State of Arizona

Elliot Glicksman, Law Office of Elliot Glicksman, P.L.L.C., Tucson, Attorney for Amicus Curiae Homicide Survivors, Inc.

Stanley G. Feldman, Haralson, Miller, Pitt, Feldman & McAnally P.L.C., Tucson, and David L. Abney, Knapp & Roberts, P.C., Scottsdale, Attorneys for Amicus Curiae Arizona Association for Justice/Arizona Trial Lawyers Association

————————————

VICE CHIEF JUSTICE PELANDER authored the opinion of the Court, in which JUSTICES BRUTINEL and TIMMER joined; CHIEF JUSTICE BALES and JUSTICE BERCH, dissenting.

————————————

VICE CHIEF JUSTICE PELANDER, opinion of the Court:

**¶1**		The question presented is whether law enforcement officers assume a duty of care to an accident victim's family by notifying the family of the victim's apparent injury or death. We hold that no duty arises from such notifications alone.

**I.**

**¶2**		The material facts, as set forth in the court of appeals' opinion, are undisputed. *Guerra v. State*, 234 Ariz. 482, 484–85 ¶¶ 2–13, 323 P.3d 765, 767–68 (App. 2014). In July 2010, April Guerra and her close friend, M.C., were seriously injured in a single-vehicle rollover. M.C. died at the scene and April was hospitalized. Because of their physical similarities and the severity of their injuries, however, the investigating Arizona Department of Public Safety ("DPS") officers and hospital medical staff had difficulty identifying which of the women died and who was hospitalized.

**¶3**		Hours after the accident, a hospital charge nurse identified the surviving patient as M.C. and told DPS officers that she was certain of that identification. The officers, joined by a DPS chaplain, then informed April's mother and aunt that April had died, but cautioned that the mother

2

would still need to positively identify the body. The mother then informed April's father, who was out of town, of April's death.

¶4 Based on additional information the Guerras furnished over the next several days, including April's dental records and thumbprint, further investigation revealed that April was the hospital patient, not the decedent. Six days after the accident and notification, April was positively identified as the hospital patient, and later, M.C. as the deceased passenger.

¶5 The Guerras sued the State and various State employees (collectively, "the State"), alleging negligence, negligent training, and intentional infliction of emotional distress. Only the negligence claim is at issue here, in which the Guerras alleged that the officers "performed a negligent and/or grossly negligent investigation into the identity of the deceased victim and wrongly concluded that [April] had died at the scene." The State moved for summary judgment, arguing that law enforcement officers owe no duty "to conduct an investigation that results in accurate identification of a deceased person." The Guerras cross-moved for partial summary judgment, arguing that the officers assumed a duty when they undertook to investigate and notify the Guerras of their daughter's death. The superior court granted the State's motion and denied the Guerras' cross-motion, implicitly finding that the officers did not owe a duty to the Guerras.

¶6 The court of appeals reversed and ordered partial summary judgment in favor of the Guerras on the duty issue. *Id.* at 491 ¶ 37, 323 P.3d at 774. We granted review because the legal issue presented is one of first impression for this Court and of statewide importance. We have jurisdiction pursuant to Article 6, Section 5(3) of the Arizona Constitution and A.R.S. § 12-120.24.

**II.**

¶7 Under Arizona's common law of negligence, "duty" is "an expression of the sum total of those considerations of policy which lead the law to say that the particular plaintiff is entitled to protection." *Ontiveros v. Borak*, 136 Ariz. 500, 508, 667 P.2d 200, 208 (1983) (quoting William L. Prosser, *Handbook of the Law of Torts* § 42, at 325–26 (4th ed. 1971)); *see also Markowitz v. Ariz. Parks Bd.*, 146 Ariz. 352, 355, 706 P.2d 364, 367 (1985) (describing "duty" as "the relation between individuals which imposes

upon one a legal obligation for the benefit of the other" (quoting *Coburn v. City of Tucson*, 143 Ariz. 50, 52, 691 P.2d 1078, 1080 (1984))). Whether a duty exists is a question of law which we determine de novo. *Stanley v. McCarver*, 208 Ariz. 219, 221 ¶ 5, 92 P.3d 849, 851 (2004). "[A]bsent some duty, an action for negligence cannot be maintained." *Gipson v. Kasey*, 214 Ariz. 141, 143 ¶ 11, 150 P.3d 228, 230 (2007).

**¶8** "Duties of care may arise from special relationships based on contract, family relations, or conduct undertaken by the defendant," *id.* at 145 ¶ 18, 150 P.3d at 232, and from public policy considerations, *id.* at ¶ 23. Foreseeability of harm is not a relevant consideration in determining the threshold legal issue of whether a duty exists, nor are case-specific facts. *Id.* at 144 ¶ 15, 145 ¶ 21, 150 P.3d at 231–32.

**A.**

**¶9** The court of appeals acknowledged, and the Guerras agree, that neither a contractual relationship nor a traditional common-law relationship (such as landowner–invitee) gives rise to a duty here. *Guerra*, 234 Ariz. at 486 ¶ 18, 323 P.3d at 769. The court nevertheless held that by undertaking to provide a next-of-kin ("NOK") notification, DPS assumed a duty of care to the Guerras—at least as to the accuracy of the information conveyed. *Id.* at 488 ¶ 21, 489 ¶ 24 n.7, 323 P.3d at 771, 772 n.7. In so holding, the court cited common law and declined to determine the applicability of Restatement (Second) of Torts § 323 (1965) ("Restatement"), the sole authority the Guerras relied on in both the superior court and court of appeals. *See id.* at 486 ¶ 18 n.5, 487–88 ¶ 21, 323 P.3d at 769 n.5, 770–71. Restatement § 323 provides:

> One who undertakes, gratuitously or for consideration, to render services to another which he should recognize as *necessary for the protection of the other's person or things*, is subject to liability to the other for physical harm resulting from his failure to exercise reasonable care to perform his undertaking, if
>
> > (a) his failure to exercise such care increases the risk of such harm, or

> (b) the harm is suffered because of the other's reliance upon the undertaking.

(Emphasis added.)

**¶10**     The State argues that Restatement § 323 does not impose a duty on law enforcement officers who undertake to provide NOK notifications because such notifications "are neither intended nor necessary to protect the recipients from physical harm to their persons or their things." Given the clear wording of § 323, the State's argument has merit. *See Lips v. Scottsdale Healthcare Corp.*, 224 Ariz. 266, 268 ¶ 10, 229 P.3d 1008, 1010 (2010) (citing Restatement § 323 for the proposition that "the common law imposes a duty of reasonable care on a party who voluntarily undertakes to protect persons or property from physical harm"); *see also Stanley*, 208 Ariz. at 223 ¶¶ 13–15, 92 P.3d at 853 (noting that our conclusion, that "public policy is better served by imposing a duty" on a doctor who "undertook a professional obligation with respect to [the plaintiff's] physical well being," comports with related Restatement § 324A).

**¶11**     This Court, however, has extended the reach of Restatement § 323 to claims of economic as well as physical harm. *McCutchen v. Hill*, 147 Ariz. 401, 404, 710 P.2d 1056, 1059 (1985) (citing Restatement § 323 to hold that a deputy's agreement not to release a father from custody until he posted a cash bond "gave rise to 'the duty to use proper care in the performance of the task' assumed" and subjected him to liability for loss of the bond (quoting W. Page Keeton et al., *Prosser and Keeton on Torts* § 56, at 379 (5th ed. 1984))). We question *McCutchen* to the extent it found a duty under Restatement § 323 without discussing whether that section encompasses economic harm. Nonetheless, other Arizona courts have since followed suit. *See Steinberger v. McVey*, 234 Ariz. 125, 137 ¶ 47, 318 P.3d 419, 431 (App. 2014) (collecting cases).

**¶12**     The dissent asserts, *infra* ¶ 30, that Restatement § 323's plain language should be stretched even further to encompass claims for purely emotional harm, separate and apart from claims for negligent infliction of emotional distress, a tort which Arizona recognizes but which clearly does not apply here. *See Villareal v. Ariz. Dep't of Transp.*, 160 Ariz. 474, 481, 774 P.2d 213, 220 (1989) ("Negligent infliction of emotional distress requires that the plaintiff witness an injury to a closely related person, suffer mental anguish that manifests itself as a physical injury, and be within the zone of

danger so as to be subject to an unreasonable risk of bodily harm created by the defendant."). Even if we interpret the word "person" broadly to refer to not only physical but also emotional wellbeing, we are not persuaded by the dissent's argument, *infra* ¶ 31, that notifying next of kin of a loved one's death is a service an officer "should recognize as necessary for the protection" of the next-of-kin's "person." Restatement § 323. Rather than protecting next of kin from emotional harm, NOK notifications are, in the dissent's words, *infra* ¶ 32, most "likely to cause continued, long-term mental disturbance." *Cf.* Dan B. Dobbs, *Undertakings and Special Relationships in Claims for Negligent Infliction of Emotional Distress*, 50 Ariz. L. Rev. 49, 63 (2008) (noting that in an action for emotional distress, the plaintiff "will lose any case that depends upon undertakings if she cannot sustain her burden of showing that the defendant undertook to use care to protect her from the particular invasion she now claims").

¶13 Moreover, imposing a duty of care whenever law enforcement officers deliver NOK notifications would be inconsistent with cases holding that officers do not owe a duty to victims or their families by undertaking to investigate a crime or accident and identify victims. *See Vasquez v. State*, 220 Ariz. 304, 313 ¶ 30, 206 P.3d 753, 762 (App. 2008) ("[A] special relationship between an investigating law enforcement agency and a decedent's family member does not arise merely by the agency undertaking to investigate an accident or resulting death."); *Morton v. Maricopa County*, 177 Ariz. 147, 149–50, 865 P.2d 808, 810–11 (App. 1993).

¶14 In *Morton*, a county sheriff's office undertook to investigate and identify partial human remains found in the desert. 177 Ariz. at 149, 865 P.2d at 810. When deputies identified the remains years after their disposal, they notified the victim's parents. *Id.* The parents sued the sheriff for negligently failing to timely identify the remains. *Id.* Relying on a California case which held that "the undertaking by the police to make a report and assure appropriate action will be taken does not create a 'special relationship' from which 'duty' is born," *id.* at 150, 865 P.2d at 811 (quoting *Shelton v. City of Westminster*, 188 Cal. Rptr. 205, 213 (Cal. Ct. App. 1982)), the *Morton* court concluded that the undertaking to identify human remains primarily "foster[s] public safety through the investigation of suspected homicides" and only "incidentally benefits friends and relatives," *id.* at 151, 865 P.2d at 812. Because this incidental purpose was insufficient to create a relationship between the sheriff's office and the victim's parents, the court held that no duty existed. *Id.*

¶15　　Similarly, *Vasquez* held that police officers, despite having undertaken an investigation into a fatal accident following a high-speed pursuit, had no duty to identify the motorist who died or to notify his next of kin. 220 Ariz. at 313 ¶ 30, 206 P.3d at 762. In so holding, the court found Restatement § 323 "clearly inapplicable." *Id.* at 314 ¶ 32 n.7, 206 P.3d at 763 n.7.

¶16　　Although the Guerras allege that the DPS officers negligently informed them that their daughter was deceased, the core of their complaint is that the officers failed to reasonably investigate the decedent's identity. The Guerras have not alleged negligence in the method or manner in which the notification was given; rather, the officers' alleged negligence arises solely from the deficient investigation that failed to reveal the charge nurse's misidentification. Given the thrust and actual underpinnings of the Guerras' negligence claim, it is difficult to square finding a duty of care in this case when no duty was found in *Morton* and *Vasquez*, cases with which we agree.

¶17　　The dissent's attempt to distinguish this case as involving a "direct relationship [that] resulted once police officers undertook to contact the Guerras," *infra* ¶ 38, is unavailing. The California case on which *Morton* relied specifically rejected the argument that a "special relationship" was created when the police "represented [to the plaintiffs that] the missing person report would be fully and completely investigated." *Morton*, 177 Ariz. at 150, 865 P.2d at 811 (quoting *Shelton*, 188 Cal. Rptr. at 212). Contrary to the dissent's suggestion, *infra* ¶ 38, we are not persuaded that the outcome in *Morton* or *Vasquez* would have been different had the officers made inaccurate representations to the plaintiffs regarding their investigations.

¶18　　Nor are we persuaded by the court of appeals' reasoning that "once law enforcement concludes sufficient evidence exists to support a NOK notification, it is necessarily the case that the investigation into the decedent's identity is, at that point, complete." *Guerra*, 234 Ariz. at 488 ¶ 22, 323 P.3d at 771. The undisputed facts of this case belie this distinction. Despite the NOK notification, the Guerras were told that they would still need to identify the body, and they later furnished additional identifying information.

7

¶19      The court of appeals and the dissent do not disagree with *Morton* or *Vasquez*, nor do the Guerras.  Because those cases evince sound reasoning that is equally applicable here, we likewise agree that officers do not owe a duty to a victim's family or friends by undertaking to investigate a crime or accident and identify victims.  No principled distinction exists between the investigation and notification for purposes of imposing a duty.  In both instances, officers do not undertake a duty to the victim's family or friends.

**B.**

¶20      Just as "[p]ublic policy may support the recognition of a duty of care," *Gipson*, 214 Ariz. at 145 ¶ 23, 150 P.3d at 232, policy considerations may militate against finding a duty in certain contexts.  "When a court or legislature adopts a no-duty rule, it generally does so based on concerns that potential liability would chill socially desirable conduct or otherwise have adverse effects."  *Id.* at 146 ¶ 29, 150 P.3d at 233.  Apart from the absence of a special relationship, in considering public policy ramifications, we conclude that the potential drawbacks of finding a duty in this case outweigh the potential benefits.

¶21      The Guerras contend—and the dissent apparently agrees—that a duty would exist even if officers inform next of kin, based on a preliminary but ongoing investigation, that a loved one "might" have died in an accident.  According to the dissent, "the care that police exercised in carrying out the investigation matters once they undertake to communicate the results to next of kin."  *Infra* ¶ 40.  But if this broad view of duty by undertaking were the law, everything law enforcement says to a victim's family during the course of an investigation could then theoretically give rise to a cause of action by the victim or the victim's family for negligent investigation.  *Cf. Vasquez*, 220 Ariz. at 313 ¶ 31, 206 P.3d at 762.

¶22      Imposing such a duty, at a minimum, would cause officers to delay in making NOK notifications.  At worst, it may deter officers from sharing whatever information they have with anxious family members for fear of litigation and possible liability.  *Cf. Gipson*, 214 Ariz. at 146 ¶ 29, 150 P.3d at 233 (noting that the no-duty rule for social hosts is justified by concerns that "[h]olding social hosts liable for harm caused by guests to whom they serve alcohol might curb desirable social exchanges"); *Wertheim v. Pima County*, 211 Ariz. 422, 427 ¶ 20, 122 P.3d 1, 6 (App. 2005) (noting that

"[c]ourts traditionally fix the duty point by balancing factors," among them "the proliferation of claims," and "public policies affecting the expansion or limitation of new channels of liability") (citation and internal quotation marks omitted); *Murillo v. Seymour Ambulance Ass'n*, 823 A.2d 1202, 1206 (Conn. 2003) (finding no duty by medical providers to bystanders witnessing medical procedures in part because of interest in "avoiding increased litigation").

¶23        Medical research confirms that uncertainty or lack of information about a loved one's status as dead or alive is traumatizing for most people.  Pauline Boss, *Ambiguous Loss Theory: Challenges for Scholars and Practitioners*, 56 Fam. Rel. 105, 105 (2007); *see also* Pauline Boss et al., *Healing Loss, Ambiguity, and Trauma: A Community-Based Intervention with Families of Union Workers Missing After the 9/11 Attack in New York City*, 29 J. Marital & Fam. Therapy 455, 458 (2003) (describing ambiguous loss as "chronic trauma").  The lack of clarity may generate conflict, ambivalence, depression, anxiety and guilt, often manifested by not being able to move on with one's life.  Pauline Boss, *Ambiguous Loss*, *in* Living Beyond Loss: Death in the Family 237, 238 (Froma Walsh & Monica McGoldrick eds., 2d ed. 2004).  Inasmuch as prompt, open, and frank communication with distraught family members of potential crime or accident victims is both critical and considerate, imposing a duty in this context would contravene rather than advance public policy.

¶24        Conversely, holding that police have no duty in this context is unlikely to cause officers to be careless or cavalier in their investigations and NOK notifications.  We expect that officers will continue to use great care to ensure that family members receive accurate and timely information in a supportive and sensitive manner.  Nor is our holding likely to result in many similar claims going unredressed.  Even the Guerras acknowledge the "rarity" of this case, noting that a recurrence of this sort of mistaken identification "appears as unlikely as getting struck by lightning."

## C.

¶25        The dissent would adopt Restatement (Third) of Torts: Liability for Physical and Emotional Harm § 47 (2012) ("Restatement Third") to find that the DPS officers assumed a duty to the Guerras by delivering the NOK notification.  *Infra* ¶ 34.  The parties, however, never cited or argued that new provision in the trial court, the court of appeals, or

this Court; nor did those other courts mention it. Regardless of the potential advantage or applicability of Restatement Third § 47 in cases such as this, it would be quite unusual and unwise for this Court to sua sponte adopt a new Restatement section that would significantly alter our jurisprudence without the benefit of any briefing or argument by the parties or amici. *See Gipson*, 214 Ariz. at 148 ¶ 41, 150 P.3d at 235 (Hurwitz, J., concurring) (expressing personal approval of Restatement Third § 7 but declining to recommend its adoption because neither party argued for it).

¶26 Although the dissent apparently restricts its proposed holding "to cases involving notifications to next of kin of a child or loved one's death," *infra* ¶ 31, Restatement Third § 47 is not so limited. But even were we to consider adopting Restatement Third § 47, it would not change our result. The comments to that section recognize that, "in the area of emotional harm, a court may decide that an identified and articulated policy is weighty enough to require the withdrawal of liability." Restatement Third § 47 cmt. d. As discussed above, the strong public interest in encouraging officers' timely communication with anxious family members of significant facts discovered through police investigations compels us to conclude that a no-duty rule in this narrow context is necessary and appropriate. We therefore hold, as a matter of policy, that the DPS officers did not assume a legal duty to the Guerras by undertaking to provide the NOK notification.

### III.

¶27 For the foregoing reasons, we vacate ¶¶ 15–28 of the court of appeals' opinion and its reinstatement of the Guerras' negligence claim, and we affirm the superior court's entry of summary judgment in favor of the State.

CHIEF JUSTICE BALES, with whom JUSTICE BERCH joins, dissenting.

**¶28** Today's decision immunizes officers for negligently misinforming parents or others of the death of a loved one. This result does not promote desirable conduct by law enforcement officers; instead, it means that those who have suffered emotional trauma and even physical injury will have no potential for redress from those who incorrectly tell them they have lost a child or other family member. Because law enforcement officers who undertake to provide next-of-kin notifications should owe a duty of care in these circumstances, I respectfully dissent.

**¶29** Concluding that no duty exists means that, "for certain categories of cases, defendants may not be held accountable for damages they carelessly cause, no matter how unreasonable their conduct." *Gipson v. Kasey*, 214 Ariz. 141, 143–44 ¶ 11, 150 P.3d 228, 230–31 (2007). But recognizing a duty does not itself mean that a defendant will incur liability; a plaintiff must still prove the other elements of negligence (breach of the duty, causation, and damages). *Id.* at 143 ¶ 9, 150 P.3d at 230. Here, recognizing that law enforcement officers have a duty of care when they undertake to notify next of kin of the death of a family member comports with our common law, the Restatement (Second) of Torts § 323, and also the Restatement (Third) of Torts § 47(b). It is also good public policy.

**¶30** We have not restricted the concept of duty to circumstances recognized in the Restatement. Instead, we have looked to whether the defendant, by virtue of his undertaking, has placed himself in a unique position to prevent harm to the plaintiff. *See Stanley v. McCarver*, 208 Ariz. 219, 223 ¶¶ 14–15, 92 P.3d 849, 853 (2004) (holding that duty existed as a matter of public policy independent of the Restatement). But even § 323, at least as interpreted by Arizona courts, would support the recognition of a duty here. As the majority acknowledges, we have applied the doctrine to purely economic harms. *See McCutchen v. Hill*, 147 Ariz. 401, 404, 710 P.2d 1056, 1059 (1985). I would similarly apply § 323 to recognize a duty when, as is the case here, the plaintiffs allege that they have suffered serious emotional harm as a result of another's undertaking.

**¶31** But even if we were to limit the doctrine to cases involving physical harm, I would still hold that the doctrine applies to cases involving notifications to next of kin of a child or loved one's death. Such an undertaking categorically is one that an actor "should recognize as

necessary for the protection of the other's person or things," Restatement (Second) of Torts § 323, even if we interpret "person or things" to mean only bodily or tangible harm. This is so because the Second Restatement defines "bodily harm" broadly:

> [L]ong continued nausea or headaches may amount to physical illness, which is bodily harm; and even long continued mental disturbance, as for example in the case of repeated hysterical attacks, or mental aberration, may be classified by the courts as illness, notwithstanding their mental character. This becomes a medical or psychiatric problem, rather than one of law.

Restatement (Second) of Torts § 436A cmt. c.[1]

**¶32** Learning of a child's death is an event likely to cause continued, long-term mental disturbance, often with resulting physical manifestations. Such manifestations, we have previously recognized, provide a guarantee that damages are not purely speculative. *See Keck v. Jackson*, 122 Ariz. 114, 115, 593 P.2d 668, 669 (1979). Bereaved parents are at a significantly increased risk of psychiatric hospitalization. Jiong Li et al., *Hospitalization for Mental Illness Among Parents After the Death of a Child*, 352 New Eng. J. Med. 1190, 1196 (2005); *see also* Shirley A. Murphey et al., *PTSD Among Bereaved Parents Following the Violent Deaths of Their 12- to 28-Year-Old Children: A Longitudinal Prospective Analysis*, 12 J. Traumatic Stress 273 (1999) (finding that "[p]arents describe the death of a child as 'devastating,' 'a pain like no other,' and as an event that has incomprehensible, lasting changes on the family"). Learning that a close family member has been violently killed in an accident can trigger post-traumatic stress disorder. *See* American Psychiatric Association, PTSD Fact Sheet 1 (2013) (discussing new guidelines for the diagnosis of post-traumatic stress disorder in the Diagnostic and Statistical Manual of Mental Disorders, 5th ed.).

---

[1] The Third Restatement rejects such a broad definition of bodily harm, but does so because it provides recovery for negligently inflicted emotional harms, whereas the Second Restatement did not. Restatement (Third) of Torts: Phys. & Emot. Harm § 4 cmt. d ("By explicitly providing for claims for negligently inflicted emotional harm in Chapter 8, this Restatement does not adopt [the Restatement (Second)'s] approach and indeed rejects it."); *see also id.* § 47 (discussed *infra* ¶¶ 34–36).

¶33     The majority suggests that, because the devastation from learning of a loved one's death will occur irrespective of how one hears about it, the delivery of the news is not "necessary for the protection" of the next-of-kin's person. *See supra* ¶ 12. This conclusion is belied by DPS's own Next-of-Kin Notification Manual, which indicates that officers undertake to make these notifications precisely because they recognize that *improperly* delivered notifications can exacerbate the harm of learning of a loved one's death. The undertaking thus seeks to protect against the *increased* harm risked by an improperly delivered notification, not from emotional harm altogether. Recognizing that officers are responsible for public safety, most people would believe the information they provide. And by undertaking to identify victims of accidents and notify their next of kin, the police protect the public from hearing the news from other, less reliable sources and from receiving it in a potentially unprofessional manner.

¶34     The best approach in this case, however, would be to simply adopt § 47 of the Restatement (Third) of Torts: Liability for Physical and Emotional Harm, which squarely addresses cases such as this one. That section provides:

> An actor whose negligent conduct causes serious emotional harm to another is subject to liability to the other if the conduct:
>
> (a) places the other in danger of immediate bodily harm and the emotional harm results from the danger; or
>
> (b) occurs in the course of specified categories of activities, undertakings, or relationships in which negligent conduct is especially likely to cause serious emotional harm.

Section 47 even contains an illustration with facts strikingly similar to those of this case:

> The Jonestown morgue negligently determines the identity of a corpse brought to it by the police department. Sadie, the sister and next of kin of the person who was erroneously determined to be the corpse, is contacted by the morgue, told of the death, and provided instructions about making final

13

arrangements for disposal of the body. Sadie, who lives out of town, does so. Upon viewing the deceased, Sadie discovers that the deceased is not her sister. As a result of this episode, Sadie suffers serious emotional harm. Jonestown is subject to liability under Subsection (b).

*Id.* cmt. f. illus. 4.

¶35        Although the Guerras do not specifically urge us to adopt § 47, they do argue that the common-law principles underlying the duty-by-undertaking doctrine are broader than the rule stated in § 323. These principles are embodied in § 47(b). We have previously adopted the principle expressed in § 47(a) by endorsing its predecessor in earlier Restatements, *see Keck*, 122 Ariz. at 115, 593 P.2d at 669, and we should also endorse § 47(b). Although we ordinarily would not consider arguments not formally preserved for our review, "we have made exceptions to questions that are of great public importance or likely to recur." *In re Leon G.*, 200 Ariz. 298, 301, 26 P.3d 481, 484 (2001), *vacated on other grounds*, *Glick v. Arizona*, 535 U.S. 982 (2002). The duty of care owed by the State to its citizens by virtue of its undertakings is, in my view, such a question. And the directness with which § 47(b) applies to cases such as this counsels even more strongly in favor of its adoption.

¶36        In adopting the precursor to § 47(b), the District of Columbia Court of Appeals observed that "[c]ourts' historic skepticism of emotional distress claims focused on three concerns: avoiding fictitious or trivial claims, the difficulty of establishing (or disproving) the nature and extent of the alleged mental injury, and limiting liability." *Hedgepeth v. Whitman Walker Clinic*, 22 A.3d 789, 795 (D.C. 2011). I agree with that court and the commentary to § 47(b) that the rule as stated in the Third Restatement adequately accounts for each of these concerns. First, by limiting itself to "serious emotional harms," the rule excludes trivial injuries. Second, by limiting its scope to those categories of activities "in which negligent conduct is especially likely to cause serious emotional harm," such as notifications of a loved one's death, the rule ensures recovery for only genuine harms whose authenticity is not likely to be in question. (Such is the case involving the death of a child.) And third, the rule protects against indeterminate liability by requiring a special relationship between the tortfeasor and the plaintiff by virtue of the undertaking.

¶37        I would thus endorse Professor Dobbs's view that "[t]he undertaking initiates a duty commensurate with what the defendant has undertaken.  That principle should apply no less in claims for emotional distress than it does in physical injury cases," Dan B. Dobbs, *Undertakings and Special Relationships in Claims for Negligent Infliction of Emotional Distress*, 50 Ariz. L. Rev. 49, 51 (2008).  This is consistent with the principle underlying the duty-by-undertaking doctrine—namely, that an actor incurs liability when, by virtue of his undertaking, he "has made the situation worse, either by increasing the danger, by misleading the plaintiff into the belief that it has been removed, or by depriving him of the possibility of help from other sources."  W. Page Keeton et al., *Prosser and Keeton on Torts* § 56, at 381 (5th ed. 1984) [hereinafter *Prosser and Keeton*].

¶38        Recognizing that the State owed the Guerras a duty of care here is not inconsistent with the decisions in *Vasquez v. State*, 220 Ariz. 304, 206 P.3d 753 (App. 2008), or *Morton v. Maricopa County*, 177 Ariz. 147, 865 P.2d 808 (App. 1993).  Neither of those cases involved a direct relationship between the police and the relatives of the deceased.  Rather, the plaintiffs' claims in those cases centered on what the police did *not* do (such as failing to solve a homicide quickly, to identify an accident victim, or to promptly reach out to the family).  Here, by contrast, a direct relationship resulted once police officers undertook to contact the Guerras to advise them of their daughter's death (a function whose primary purpose, unlike that in *Morton*, was to benefit the surviving relatives).  *See* 177 Ariz. at 151, 865 P.2d at 812 (holding that no special relationship existed because the purpose of "identifying human remains is primarily to foster public safety through the investigation of suspected homicides," and this function only "incidentally benefits friends and relatives").  Moreover, the Guerras' complaint rests on what the officers *did* do: delivering inaccurate news of their daughter's death.

¶39        The majority finds it unconvincing that the police could have no duty to conduct the underlying investigation, but that they could be held liable for carelessly communicating its conclusion.  The Guerras, after all, do not fault the police for the manner of the delivery, but rather for the contents of what they communicated.  The contents of what was communicated, the majority maintains, cannot be separated from the underlying investigation which the police originally had no duty to perform.

**¶40**        But that is precisely how the duty-by-undertaking doctrine works.  Consider the case of the truck driver who undertakes to signal to other drivers that they may safely pass.  That driver "may be under no obligation whatever to signal to a car behind him that it may safely pass." *Prosser and Keeton* at 378.  Similarly, police officers may be under no obligation to conduct an investigation.  *Vasquez*, 220 Ariz. at 313 ¶ 30, 206 P.3d at 762; *Morton*, 177 Ariz. at 151, 865 P.2d at 812.  But if the truck driver *does* signal, "he will be liable if he fails to exercise proper care and injury results." *Prosser and Keeton* at 378.  The care with which he carried out the signaling—a function which, like police investigations, he otherwise had no underlying duty to perform—becomes legally relevant once a special relationship is created between him and the drivers relying on him to signal with due care.  Likewise, the care that police exercised in carrying out the investigation matters once they undertake to communicate the results to next of kin.  At that point, a special relationship between the police and the next of kin exists so as to sustain a duty of care.  Like the truck driver's not having a duty to wave drivers through in the first place, the police not having an underlying duty to conduct the investigation is beside the point once a special relationship is created.

**¶41**        In addition to concluding that no duty was created by undertaking, the majority argues that policy concerns support a "no-duty" rule.  I respectfully disagree.  As discussed above, § 47 of the Third Restatement circumscribes duty to such limited circumstances so as to prevent indeterminate liability.  More importantly, though, the policy arguments made by the majority either expect too little of law enforcement officers (taking at face value the State's assertion that they will refuse to undertake tasks unless they can do so with impunity), or they exaggerate the "drawbacks," *supra* ¶ 20, of holding that officers owe a duty of care in telling someone a loved one has died.

**¶42**        "We do not favor special rules of tort nonliability or immunity." *Ontiveros v. Borak*, 136 Ariz. 500, 512, 667 P.2d 200, 212 (1983).  Indeed, judicially created rules of non-liability are exceedingly rare.  Rather, "[t]his court is committed to the principle that no person and no group should be given special privileges to negligently injure others without bearing the consequences of such conduct." *Id.*  The same principle should apply to the State.  No-duty rules "should be invoked only when all cases they cover fall substantially within the policy that frees the defendant of

liability." 1 Dan B. Dobbs, *The Law of Torts* § 227, at 579 (2001). This is not such a case.

**¶43** The State maintains that imposing a duty in this case would risk having police officers abstain from delivering next-of-kin notifications altogether or to delay delivering notifications until they could be absolutely sure of their accuracy. But to entertain this argument is to accept the facile notion that one will not engage in conduct unless he can do so recklessly and with impunity. All members of society regularly engage in activities for which they owe duties of reasonable care to others. That we have a duty of care in operating a motor vehicle does not keep most of us from driving to work every day.

**¶44** It is true that *Gipson* recognized that no-duty rules may be appropriate when "potential liability would chill socially desirable conduct or otherwise have adverse effects." 214 Ariz. at 146 ¶ 29, 150 P.3d at 233. But it is important to maintain the distinction between duty and the actual likelihood of liability. No-duty rules are appropriate when liability could realistically result and therefore deter socially beneficial conduct. It is impossible to assess "potential liability," *id.*, without some reference to the standard of care. The State's claim that officers will delay notifications or avoid giving them altogether is credible only if the standard of care required that officers give perfect, conclusive information about a loved one's fate or else face liability. But the standard of reasonable care does not demand perfection. *See Coburn v. City of Tucson*, 143 Ariz. 50, 54, 691 P.2d 1078, 1082 (1984) ("The city is not bound to provide perfect intersections or streets, but only those which are 'reasonably safe.'"). A factfinder is extremely unlikely to find that the State breached its duty of care if it hedged its news by emphasizing that the identification was tentative and the investigation ongoing.

**¶45** More generally, the fact that certain conduct may be socially desirable does not itself warrant a no-duty rule. Duty, after all, is but "an expression of the sum total of those considerations of policy which lead the law to say that the particular plaintiff is entitled to protection." *Ontiveros*, 136 Ariz. at 508, 667 P.2d at 208. Although potential liability may discourage some desirable conduct, recognizing a duty of care serves the important goals of deterring unsafe conduct and compensating those injured by another's carelessness. That misidentification may rarely occur, *see supra* ¶ 24, does not support broadly absolving officers of any duty of

care or denying persons injured by careless notifications any chance for redress. And the duty-by-undertaking doctrine—which we all agree applies to at least some physical harms—subjects actors who undertake to help others to potential liability. Thus, our endorsement of the doctrine rejects the notion that socially desirable undertakings should, merely by virtue of their public benefit, be immunized from liability.

¶46 Because our law strongly disfavors categorical tort immunity, *see Ontiveros*, 136 Ariz. at 512, 667 P.2d at 212, and the interests in deterrence and compensation have particular force with respect to negligent notifications of the death of a child or other loved one, a no-duty rule is simply not appropriate here. I respectfully dissent.